*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
KING, HITESMAN, and GASTON,
Appellate Military Judges

————————————

**UNITED STATES**
Appellee

**v.**

**Marvin J. MASA**
Naval Aircrewman (Helicopter) Second Class (E-5), U.S. Navy
Appellant

**No. 201800314**

Decided: 13 January 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Commander Hayes Larson, JAGC, USN. Sentence adjudged 15 May 2018 by a general court-martial convened at Naval Station Norfolk, Virginia, consisting of officer and enlisted members. Sentenced approved by the convening authority: confinement for eight years and a dishonorable discharge.

For Appellant: Mr. Robert Feldmeir, Esq., and Captain Thomas Fricton, USMC.

For Appellee: Major Clayton Wiggins, USMC, and Lieutenant Kimberly Rios, JAGC, USN.

Senior Judge KING delivered the opinion of the Court, in which Senior Judge HITESMAN and Judge GASTON joined.

————————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

––––––––––––––––––––––––

KING, Senior Judge:

Appellant was convicted, contrary to his pleas, of two specifications of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. He now asserts three assignments of error: (1) the evidence is factually insufficient to support the convictions; (2) the military judge erred when he refused to admit opinion evidence that victim NS engages in "attention seeking behavior;" and (3) that "dilatory post-trial processing" warrants relief. We affirm one of the convictions, set aside the other, set aside the sentence, and remand the case to the Judge Advocate General, who may order a rehearing on sentence.

## I. BACKGROUND

Appellant was convicted of sexually assaulting two different victims in two separate incidents. The first incident, involving NC, occurred in Bahrain in March 2016. The second incident, involving NS, occurred in Virginia Beach in July 2016. We address each in turn.

### A. Sexual Assault of NC

NC and Appellant worked in the same squadron in Bahrain and were housed in the same multi-story civilian apartment building as were the squadron's other Sailors. On the evening of 8 March 2016, NC socialized and played drinking games with Appellant and other Sailors within the building. At trial, a witness from that evening testified that she did not see Appellant and NC engage in any type of flirting behavior prior to NC retiring for the night. The Defense offered evidence from one witness that he had observed NC wear Appellant's hat and hug Appellant on a previous occasion.

Around 0100, elevator camera footage captured NC apparently returning alone to the bedroom she shared with her roommate, AD2 Clark. AD2 Clark, who was intoxicated that evening, testified that she and NC left a string of Christmas lights hung in the bedroom constantly on. However, when AD2 Clark awoke that night, she noticed these lights were out and she saw a male body moving on top of someone else in NC's bed, which was just a few feet away. She also heard the male moaning as if he were engaged in sexual intercourse. Although NC had never engaged in sexual activity in the bedroom before, AD2 Clark believed NC was having consensual sexual intercourse and

left the room to give her privacy. When she returned, the room was still dark, the man was gone, and AD2 Clark tried unsuccessfully to wake NC by shaking her and calling her name.

When NC woke the next morning, she was confused because her clothing was removed and her vagina was sore. When AD2 Clark told NC what she had seen and heard the night before, NC "instantly started to cry" because she had no memory of that activity. NC, her husband, and AD2 Clark all testified that NC was a very heavy sleeper.

AD2 Clark recognized a red hat in the room that she believed to belong to Appellant, so she sent Appellant a text. After Appellant explained he did not know where his hat was, AD2 Clark told him to come retrieve it, which he immediately did, meeting AD2 Clark at the door. Later, NC sent Appellant an electronic message asking whether they had sex the night before, to which Appellant responded "no, why." When NC explained she wanted to know in case she needed "to get tested or a pill or anything," Appellant responded "[h]ypothetically speaking, would it be a bad thing if we did have sex," adding that his "pullout game was strong." When NCIS later asked for this message, NC was unable to produce it, saying she routinely deleted her messages because she allowed other Sailors to use her phone to communicate and did not want those messages accessible.

NC and AD2 Clark then went to another Sailor, Ms. Sikorski,[1] and explained to her what had happened. Sikorski and NC went to the building's security desk and viewed security footage in an effort to determine who had entered their floor. The footage apparently did not show Appellant using the elevators at the time in question. Sikorski advised NC to go to medical, where NC underwent a forensic examination during which DNA samples were collected. At the exam, NC declined to provide information about the assault, declined to allow pictures to be taken, declined to provide samples to determine toxicology results, and filed a restricted report, all because she did not want her command to know she had been assaulted.

On 16 March 2016, NC and other squadron Sailors went to a Disciplinary Review Board (DRB), a Navy precursor to Non-Judicial Punishment (NJP), for an unrelated drunk and disorderly conduct event. The recommendation of the DRB was to drop charges. The next day, NC made her sexual assault report unrestricted, testifying she did so because she discovered that the DNA samples would not be tested if the report remained restricted. On 22

---

[1] When Ms. Sikorski testified, she had been released from active duty. The record does not indicate her rank while on active duty.

March 2016, despite the DRB's recommendation, the Commanding Officer awarded NJP to NC and, as a result, redeployed her to the United States. Once she arrived back at her unit, NC was placed on the same shift as Appellant, who had also redeployed back to the U.S. When she complained, she was informed she could ask to be expeditiously transferred to another unit. She did, and her request was granted. The DNA was eventually tested, and a forensic examiner testified at trial that DNA matching Appellant was found in NC's cervix.

The Defense offered evidence of previous incidents the Defense characterized as NC raising "false" allegations of sexual assault. In June 2011, NC claimed that she had been digitally penetrated in her sleep, found ejaculate in her bikini bottoms, and reported that as a sexual assault. However, DNA testing found no evidence of ejaculate and NC was informed there was insufficient evidence to pursue charges. There is no evidence that NC's duties or duty location changed as a result of her reporting this incident.

In addition, a few months prior to the sexual assault involving Appellant, NC reported that Lieutenant (LT) B sexually harassed her while in Bahrain. At trial, NC's Command Master Chief (CMC) testified that NC told him LT B had sexually *assaulted* her. The CMC also opined that NC was untruthful based upon his limited interactions with her. NC's former Executive Officer also testified that NC was not truthful. In rebuttal, three Government witnesses opined that NC was a truthful person.

Finally, Appellant made two subsequent statements regarding whether he had engaged in sexual intercourse with NC. The first was to his friend AWS2 Cagliani, with whom Appellant spoke shortly before Appellant was redeployed. Although AWS2 Cagliani could not recall what was specifically said during that conversation, he testified that Appellant left him with the impression that Appellant and NC had not engaged in sexual intercourse. Next, less than six months after the assault, Appellant told NCIS it had been "one and a half years" since he had engaged in sexual activity.

**B. Sexual Assault of NS**

Appellant was redeployed shortly after NC's allegations in March 2016. On or about 19 July 2016, Airman NS met Appellant online via a dating application. Each expressed interest in the other due to their shared religious convictions. Within days, prior to even meeting Appellant, NS posted pictures of Appellant on her social media announcing "how close" they were and that Appellant was her "future husband."

For their very first meeting, the pair decided to attend Appellant's church. Because NS did not have a car, Appellant picked her up and drove her to his church, where he introduced NS to his pastor, Mrs. Payton. During the

church service, NS seemed enthusiastic and actively engaged with the other parishioners. At the end of the service, in an apparent offer to assist or join the congregation, NS told the pastor that she could play the keyboard. When the pastor invited her to demonstrate, NS was unable to play, claiming she could only play a "special kind" of keyboard. NS offered to purchase this keyboard for the church but the pastor declined. NS then told the pastor that she could sing and the pastor again offered her the opportunity to demonstrate. NS tried and the pastor testified that NS "couldn't do that either."

Afterwards, Appellant took NS to a local restaurant for dinner. While inside the car NS claims Appellant told her that he was accused of raping someone but that "he didn't do it." NS testified that Appellant then made some disparaging comments about males dressed like females in the restaurant and that he became "Joker type happy" and said he was going to "kill" these men, a threat NS claimed that she believed. When asked why she didn't leave or report such a serious threat, NS claimed that Appellant later "calmed down and became happy again." Once inside the restaurant, the two talked about sexual activity, and according to NS, Appellant asked NS whether "he could rape her." NS said that such a question came out of the blue, was "disgusting," and "startled" her. She then agreed to go home with him. Appellant told NCIS that they discussed "rough" sex but "nothing along the lines of I want to rape you." Finally, Appellant stated that while in the restaurant, NS asked him, "you know you're going to be my husband, right?"

While the original plan was for Appellant to drive NS back to her barracks that night, Appellant told NS he was "too tired" to make the forty-five minute drive at midnight and offered for NS to sleep on the "black couch" at his apartment instead. According to Appellant, NS readily concurred and they went to a local store to buy her a toothbrush. According to NS, she acquiesced only because she had no money and her credit card was "blocked." There is no indication on the record whether NS considered additional options for returning to her barracks. When the pair left the restaurant, NS videotaped herself laughing and interacting with the Appellant in a jovial way, and posted that video to social media.

Inside Appellant's apartment there was a black, full-size couch in the common area and a smaller, black futon in his bedroom right next to his bed. The charged sexual act took place on the futon and NS remained on the futon for the rest of the evening. Why NS went to the futon next to Appellant's bed instead of the couch in the common area was a central issue at trial. On direct examination, NS testified that Appellant told her she would be sleep-

ing on the "black couch," but later testified that Appellant said she would be sleeping on the "black futon" in his bedroom.[2] When asked about the black couch, NS testified that it was "covered in dog hair" and that she was "uncomfortable sleeping there." Appellant told NCIS that he offered NS the black couch to sleep on but that she went of her own accord to the futon in his bedroom.

Appellant said NS kissed him as he was entering his apartment, then went immediately into his bedroom, where he gave her a pair of his shorts and a shirt, and she changed inside of his closet but in full view of him. He said NS then began playing "bump and grind" music and dancing provocatively. Eventually, NS lay face down on the futon, "temptation took over," and he told NS to "take your shorts off." According to Appellant, NS complied and the two had consensual, active sex in three different positions on the futon, including two initiated by NS. Appellant asked NS if he could ejaculate inside of her and NS said yes, and he did so.

NS testified that the two held hands, but otherwise had no romantic contact until the alleged assault. She said she showered upon arrival, put her own clothes back on and went to Appellant's bedroom where he gave her a pair of shorts and a shirt. Appellant, smaller in stature than NS, claimed she struggled to fit into his shorts. Once changed, NS testified that she lay down on the black futon and began listening to music on her phone until her phone died. NS testified she then asked Appellant for a charger for her iPhone, but Appellant said he didn't have one, "even though he had an iPhone." She said she fell asleep for a short period and when she awoke, Appellant came from the kitchen, turned out the lights, approached her in the dark, placed the palm of his hand in the small of her back, and told her he was now going to do the "same thing" that he did in Bahrain. NS testified that she did nothing in response because she "was frozen." She said Appellant then put "a lot of force, it was like he was 300 pounds" on her, pulled the shorts he had loaned her down with his free hand, and began engaging in vaginal intercourse with NS from behind. NS testified that she told him to stop but that she was not able to "resist in any way." NS said Appellant then moved his hands to the back of her neck and pushed her head down so that she was "not able to move." Once Appellant ejaculated, he moved to his bed. NS said she pulled her shorts back up but otherwise remained "frozen." She said she was unable to utilize her dead phone to call for help and spent the rest of the night sleepless on the futon.

---

[2] Appellant told NCIS that he offered NS the black couch to sleep on.

NS testified that the next morning she took a shower, put on fresh clothes that Appellant provided her, and left with him to go to church. She said she grew angry with Appellant in the car and accused him of "raping" her, and that Appellant replied, "I did, but I know how to get away with it." She said that when they entered the church, she sat in the back, feeling "hopeless and helpless" while Appellant began his church duties. She said that once the services ended, she was approached by Ms. Payton, who asked her "what's wrong," and NS replied that Appellant had raped her. NS said Ms. Payton and Ms. Simpson, spoke with her for about two hours, and that Ms. Payton told them Appellant had confessed to the sexual assault but asked NS to not report Appellant, and then arranged for a ride for NS back to her barracks.

Appellant's version differs radically. He claimed that as soon as the two woke up in the morning, NS began demanding constant attention and he felt as if he "couldn't breathe." He said he was disgusted by the fact that NS refused to shower that evening or the next morning. He said he asked NS to "give him some space" and that "on the car ride there . . . she kinda got offended by me saying that and when I talk I'm blunt, I'm honest, and so, I'm like 'hey, just relax. We're not together, I don't want you breathing down my back. I don't have to show you all of this attention. We're just hanging out. We're friends.'" He continued, "I think from that point on she got offended . . . the mood was kind of messed up in the car. She kind of didn't really want to talk to me, went in to the church and [thirty] minutes later she was texting me trying to get my attention." He continued to tell NS to "leave me alone."

Appellant said Ms. Payton noticed that something was wrong between him and NS and spoke with both of them. He said that during the course of that conversation, NS complained about the way Appellant was treating her and that he asked NS "do you want me to tell her [Ms. Payton] what happened last night?" He said he then explained to Ms. Payton that he had engaged in sex with NS the night before. He said that during that conversation, NS said that she had a family member that was a master chief in the Navy and that she was going to ruin his career.

Ms. Payton testified that Appellant did not admit to "rape" at the table. Instead, she testified that NS said, "I thought we were boyfriend and girlfriend," to which Appellant responded "we're nothing to each other." Ms. Payton testified that NS "was angry" at that point and "started threatening" to "destroy" Appellant.

Ms. Simpson also supported Appellant's claim that NS said she was going to ruin his career. She testified that NS was "happy and smiling . . . outgoing" the first night but "quiet and withdrawn" at church the next morning. She testified that she and Ms. Payton were sitting at a table after church when Appellant and NS approached and sat down. While she was unsure of the

sequence of comments, she recalled NS told Appellant "you raped me," to which Appellant responded with a smirk "yea, and you liked it." She also recalled Appellant being irritated that morning because NS had posted his pictures on her social media and called him her "boyfriend." When Appellant then said "it's over," or words to that effect, NS "got angry and said she "had people in the Navy and was going to ruin [Appellant's] career."

Ms. Simpson also contradicted NS's testimony that Ms. Payton asked NS to not report Appellant. She further testified that Ms. Payton never told her Appellant admitted to sexually assaulting NS, which corroborated Ms. Payton's testimony and contradicted NS's testimony.

When she later arrived back at her barracks, NS told her neighbor and made a restricted report. Two months later, she modified the report to unrestricted. When interviewed by NCIS, she said she also reported the assault to a Chief Petty Officer, but she refused to provide the name of the Chief to NCIS. After she modified her report to unrestricted, she requested and was granted expeditious transfer off the aircraft carrier to which she was assigned and sent to shore duty at a medical facility.

## II. DISCUSSION

### A. Factual Sufficiency of Sexual Assaults

We review the factual sufficiency of the evidence de novo. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) and determine whether, "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are . . . convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399.

> By "reasonable doubt" is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. . . . The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt.

*United States v. Loving*, 41 M.J. 213, 281 (C.A.A.F. 1994).

*1. Sexual assault of NC*

Appellant was convicted of sexual assault, in violation of Article 120(b)(1)(B), UCMJ, requiring the Government prove beyond a reasonable doubt that Appellant: (1) committed a sexual act upon NC by causing penetration, however slight, of the vulva . . . by the penis; and (2) did so by causing bodily harm to NC and, (3) did so without the consent of NC.[3] Bodily harm "means any offensive touching of another, however slight, including any nonconsensual sexual act[.]" Art. 120(g)(3), UCMJ. Consent is defined as a freely given agreement to the conduct at issue by a competent person. The evidence is sufficient to convince us of Appellant's guilt of this specification beyond a reasonable doubt. AD2 Clark testified that she saw and heard a male in NC's bed moving and moaning as if he were engaged in sexual activity; NC awoke, undressed and experienced soreness in her vagina; Appellant's hat was found in NC's room; and Appellant's DNA was found in NC's cervix— a combination of evidence sufficient to prove that Appellant engaged in a sexual act with NC.

Regarding lack of consent, we note the following: the weight of the evidence indicates NC showed no romantic interest in Appellant; video footage showed NC returned to her room by herself; lights in the bedroom that were routinely left on were out during the intercourse; and NC instantly started to cry when told that a man had been in her bed the night before. Finally, and significantly, Appellant denied they had intercourse when NC asked and he lied to investigators when they asked how long it had been since he had had sexual intercourse.

Appellant asserts the evidence is factually insufficient to support the conviction due to the "lack of substantiating evidence, [NC's] extremely poor character for truthfulness . . ., and [her] clear motive to fabricate." Specifically, Appellant invites us to conclude that NC is "a dishonest person who has a track record of leveraging the sexual assault reporting system for her personal advantage through false allegations." To support his contention, Appellant argues the allegations NC made in 2011 and the allegations that she claimed LT B had sexually *assaulted* her in 2016 are indicative that NC falsely reports allegations of sexual assault. We disagree for several reasons.

First, the record is void as to what motive NC would have to falsely claim she was sexually assaulted in 2011, nor is there any indication of animus against that accused. Regarding the allegations against LT B, the CMC's testimony was less than definitive. He testified that he met NC in November

---

[3] Appellant was acquitted of sexual assaulting NC while she was sleeping.

2016, when the CMC joined the unit to which NC had transferred upon returning from Bahrain. Because she had a "SAPR advocate for a sexual assault" and she discussed her case about LT B, it appears the CMC connected the two: "That is the only person I know that she was ever involved with as a sexual assault or conversation with her, not anybody else."

Regarding her motive to fabricate, the Defense challenged NC's reasons for declining to allow the forensic examiner to conduct a full examination or to file an unrestricted report, claiming she did so only to ward off an imminent NJP. To this point, NC testified that she filed a restricted report because she did not want to bring attention to herself and that she changed her report to unrestricted when she learned that step was required in order to have the DNA sample tested. While the timing and circumstances of NC's decision to make the report unrestricted may raise a question as to her motive, we find this issue was fully litigated at trial, including extensive cross examination of NC on this point.

Finally, on the issue of general truthfulness, the Government offered the opinions of NC's ex-husband, AD2 Clark, and other co-workers, all of whom testified that NC was truthful. When weighed against the Defense evidence of NC's former Executive Officer and CMC, both of whom knew NC for only a limited period of time and had limited interactions with her, most of which involved disciplinary issues, we decline Appellant's invitation to conclude that NC had "an extremely poor character for truthfulness."

We are convinced beyond a reasonable doubt of Appellant's guilt on this specification.

### 2. *Sexual assault of NS*

Appellant was also convicted of the sexual assault of NS, in violation of Article 120a(b)(1)(B), UCMJ, requiring the Government prove beyond a reasonable doubt that Appellant: (1) committed a sexual act upon NS by causing penetration, however slight, of her vulva . . . by his penis; and (2) did so by causing bodily harm to NS by pressing his bodyweight on her back. Appellant claims this conviction was factually insufficient, and we agree.

To prove Appellant's guilt, the Government's evidence consisted of Appellant's recorded interview with NCIS, the testimony of NS, and the testimony of Ms. Simpson. In answering the questions of NCIS investigators, Appellant said he had not engaged in sexual intercourse in over seven months, a demonstrable falsehood as his semen was found in NC six months prior. The remainder of the evidence against Appellant came from NS herself, making her credibility of central importance to the prosecution's case. In examining the record closely, and for several reasons, we find that credibility wanting.

First, several key parts of NS' testimony were either discredited or contradicted by other witnesses. When questioned by NCIS, NS implicitly supported Appellant's claim that he offered her the couch in the living room, saying that "the black couch is where dog hair and stuff was, so I'm like you clearly don't want me sleeping on this couch, it's [got] dog hair everywhere." But at trial, NS testified that Appellant told her to sleep on the futon next to his bed and she simply complied. NS also testified that Appellant admitted to Ms. Payton that he raped NS and that Ms. Payton told her to not "do anything" for fear of hurting Appellant's career but Ms. Payton flatly denied both claims. Finally, both Ms. Payton and Ms. Simpson testified that they heard Appellant tell NS it "was over," that NS became angry, and that NS threatened Appellant. Even Ms. Simpson, who testified about Appellant's response when NS said "you raped me," testified on redirect that Appellant "end[ed]" the nascent relationship before NS claimed he sexually assaulted her.

Second, NS's supervisor, Chief Petty Officer (CPO) Kelly, testified that NS was the "least truthful [S]ailor she had ever led in [her] career." CPO Kelly explained that among other things, NS lied to her command about having to leave work for appointments with NCIS or prosecutors that did not actually exist. However, most concerning is the seemingly incompetent memory NS displayed during cross examination.

Under questioning by the trial counsel, NS's memory was unencumbered, only once failing to recall a detail asked of her—the name of the song she was listening to when the assault began. But for that single instance on direct examination, NS was able to recall every detail of her story, including even the color of the clothes Appellant gave her. Yet when defense counsel asked for details probing inconsistencies in her testimony, NS answered "I don't remember" over fifty different times, including to routine questions such as "Are you married now?" The following is a representative example of such testimony:

> Q.     You offered to give NCIS a copy of your text message communications with AWS2 Masa, didn't you?
>
> A.     I don't remember, sir.
>
> Q.     Would it help to refresh your recollection if you reviewed the transcript of your interview with NCIS?
>
> A.     No, sir.
>
> Q.     All right. So about six questions ago, we were talking about the [C]hief [P]etty [O]fficer, do you remember that?
>
> A.     Yes, sir.

11

Q. Okay. So you remember us talking about the [C]hief [P]etty [O]fficer and I said did you tell NCIS that you told the [C]hief [P]etty [O]fficer about the sexual assault, and your response was I don't remember?

A. Yes, sir.

Q. All right. And then I said would it help you to refresh your recollection to review the transcript of that interview with NCIS, and you said yes?

A. Yes, sir.

Q. You looked at the transcript. You read it. You looked up at me. I took it from you. And you said your recollection had been refreshed, correct?

A. Yes, sir.

Q. And then you were able to testify about what happened in that NCIS interview?

A. Yes, sir.

Q. But you're telling me now that the same process of refreshing your recollection with the exact same document will not work?

A. No, sir.

Q. Because you don't want to testify that you did not provide your text messages to NCIS?

A. Wrong, sir.

Q. Did you provide your text messages NCIS?

A. I don't remember, sir.

Q. So you may have?

A. I don't remember, sir.

Q. Could you have given your text messages to NCIS?

A. I don't remember, sir.

Q. Is it a possibility?

A. I don't remember, sir.

Q. Would it refresh your recollection to review the transcript of your interview with NCIS where they ask you for the text messages?

A. No, sir.

> Q. Would it help you to review the portion where you say I'll give you my text messages?
>
> A. No, sir.
>
> Q. Because that wouldn't refresh your recollection?
>
> A. No, sir.
>
> Q. Because there's no way reading a transcript that was produced by the [G]overnment of exactly what you said would make you remember that?
>
> A. No, sir.
>
> Q. Even though it did now 15 questions ago?
>
> A. No, sir.
>
> Q. At some point in the fall of 2016, you text messaged to your father?
>
> A. I don't remember, sir.
>
> Q. And his response was that you do stupid stuff for attention?
>
> A. I don't remember, sir.[4]

Another example occurs when NS was questioned regarding the lack of physical evidence found during her forensic examination:

> Q. During the sexual assault forensic examination, the sexual assault forensic examiner, the woman, asked you to tell her what happened?
>
> A. I don't remember, sir.
>
> Q. Did you tell the woman what happened?
>
> A. I don't remember, sir.
>
> Q. [NS], how can you possibly not remember?
>
> A. I don't remember. I just remember what I said, not what she said, sir.
>
> Q. So do you remember telling the sexual assault forensic examiner what happened?

---

[4] Record at 1040-42.

13

A.    I don't remember, sir.

Q.    [NS] you just told me you remembered what you said?

A.    Yes, sir, about the hand, sir.

Q.    And that's the only thing you remember saying?

A.    I don't remember, sir.

Q.    You told the sexual assault forensic examiner that AWS2 Masa grabbed your neck in response to a question from her?

A.    Yes, sir.

Q.    A specific question from her?

A.    I don't remember, sir.

Q.    The specific question was, at any time did he put his hands around your neck?

A.    I don't remember, sir.

Q.    And your response was yes?

A.    I don't remember, sir.

Q.    But you did not spontaneously make that statement to the sexual assault forensic examiner, did you?

A.    I don't remember, sir.

Q.    You claimed your throat was sore the next day?

A.    I don't remember, sir.

Q.    Do you remember claiming that you had a sore throat?

A.    I don't remember, sir.

Q.    And that your voice was hoarse?

A.    I don't remember.[5]

At one point, NS explained that she answered "I don't remember" because defense counsel was "yelling" at her. While we are familiar with the stress that complaining witnesses may experience when being cross-examined about an allegation of sexual assault in open court, such stress must never justify

---

[5] Record at 1026-27

anything less than truthful responses to every question asked.[6] After claiming time and again to not remember so many important facts and even routine matters, and then routinely stating that her own recorded responses would not help refresh her memory, we are left to conclude either that her ability to recall was deficient on cross-examination to the point of legal incompetence or her memory lapses were feigned.

Contrast NS's testimony with Appellant's responses to NCIS during a multi-hour video-recorded session with two trained investigators. Appellant agreed to speak to them, told his story matter-of-factly, answered every one of their questions, gave them samples of his DNA, authorized them to search his phone (a Samsung, not an iPhone as NS claimed), and permitted them to enter his apartment to take pictures. Moreover, despite two professional investigators repeatedly attempting to convince him to "see it" as a sexual assault, Appellant did not waiver, hesitate, nor modify in the slightest his account that it was a consensual sexual encounter, even after an agent urged Appellant to "tell the truth" by appealing to Appellant's religious belief that he will be judged one day "at the Pearly Gates."

We recognize and greatly respect that the members saw and heard the witnesses testify. However, we also recognize the mandate of Congress that this Court itself be convinced beyond a reasonable doubt of Appellant's guilt.[7] Art 66(c), UCMJ. Faced with a conviction grounded near-solely on the word of a complaining witness with a poor reputation for truthfulness, and whose testimony was riddled with implausible claims of not being able to remember pertinent facts, we are far from being so convinced. This conviction must be set aside.[8]

## B. Sentence Reassessment

Finding one of the two sexual assault convictions factually insufficient, we next determine if we may reassess the sentence in accordance with the prin-

---

[6] We also note that, although VLC lodged an objection to Defense Counsel's method, the Military Judge declined to intervene, indicating the manner of questioning was not inappropriate.

[7] We note with peculiarity that the specification alleged Appellant committed the sexual assault on NS by causing bodily harm, to wit: "grabbing her hands and holding them behind her back and pressing his bodyweight on her back." However, no evidence was admitted to support the language "grabbing her hands and holding them behind her back" and the military judge granted the defense request for a finding of not guilty to these words under R.C.M. 917.

[8] This action renders moot Appellant's second assignment of error.

ciples set forth in *United States v. Moffeit*, 63 M.J. 40 (C.A.A.F. 2006) and *United States v. Sales*, 22 M.J. 305, 307-09 (C.M.A. 1986). Under the right circumstances, we may "modify sentences 'more expeditiously, more intelligently, and more fairly' than a new court-martial[.]" *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013) (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)). This recognizes the "difficulties inherent in sentence rehearings" and that ordering a rehearing—as opposed to the CCA reassessing the sentence itself—"merely substitutes one group of nonparticipants in the original trial for another." *Id.* (citation and internal quotation marks omitted).

But reassessing a sentence is only appropriate if we are able to confidently determine that, "absent the error, the sentence 'would have been at least of a certain magnitude.'" *United States v. Buber*, 62 M.J. 476, 479 (C.A.A.F. 2006) (quoting *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002)). Further, we must endeavor to reliably assess "what sentence the members would have imposed" were it not for the error. *Id.* (quoting *United States v. Vasquez*, 54 M.J. 303, 306 (C.A.A.F. 2001)). If we cannot, we must order a rehearing. We base this determination on the totality of the circumstances of each case, guided by the following "illustrative, but not dispositive, points of analysis":

(1) Whether there has been a dramatic change in the penalty landscape or exposure;

(2) Whether sentencing was by members or a military judge alone. We are more likely to be certain of what sentence a military judge would have imposed as opposed to members;

(3) Whether the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses and, similarly, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;

(4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

*Winckelmann*, 73 M.J. at 15-16.

Each of the sexual assaults carried a maximum sentence to confinement of thirty years. A reduction of confinement exposure from sixty years to thirty presents a dramatic change in the punishment to which Appellant was exposed. Although this court has familiarity with the sentences imposed in sexual assault cases, Appellant requested and was sentenced by members. Under these circumstances, we do not find a reassessment of his sentence to be appropriate.

**C. Dilatory Post-Trial Processing**

Whether an appellant has been deprived of his due process right to a speedy appellate review is a question of law we review de novo. *United States v. Bush*, 68 M.J. 96, 102 (C.A.A.F. 2000). When facially unreasonable delays in appellate review occur, claims that such delay violate due process are reviewed under the four-part test laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). In such analysis, we balance the (1) length of delay; (2) reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. No one factor is determinative and the court will decide whether each factor favors the government or the appellant. *Id*. at 136.

If the period between completion of the trial and the convening authority's final action is greater than 120 days, the delay is presumed to be facially unreasonable. *Id*. at 142. Here, the Government concedes the delay between the completion of the court-martial on 15 May 2018 and the convening authority's action on 9 October 2018 totaled 147 days. As such, the delay is unreasonable on its face, triggering a full *Barker/Moreno* analysis.

The presumption of unreasonableness may be overcome by a showing of legitimate, case-specific circumstances. *Id*. at 142-43; see also *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F 2011). Here, due to software problems encountered when the Navy upgraded the operating system on its computers, production and authentication of the record of trial took 108 days. The Staff Judge Advocate (SJA) completed her review and served her recommendation on defense counsel nine days later, on 7 September 2018. Defense requested and received an additional 20 days to file clemency matters and filed such matters on 7 October 2018. The SJA completed her supplemental recommendation two days later on 8 October 2018, and the convening authority acted one day after that on 9 October 2018. In that action, the convening authority explained that post-trial processing delay was caused by software problems and a "heavy court docket."

As our superior court has stated in *Moreno*, "heavy court dockets" will not, without exceptional circumstances, justify delay in post-trial processing. *See Moreno*, 63 M.J. at 137 (citing *Barker*, 407 U.S. at 531 (noting that ultimate responsibility of delay caused by negligence or overcrowded courts rests with the Government)). This factor favors Appellant.

Next, this Court looks at whether the appellant objected to the delay or asserted his right to timely review. *See Arriaga*, 70 M.J. at 57. No such objection was lodged nor was a request for speedy post-trial review filed.

When analyzing the fourth factor, prejudice, the Court should consider three interests in a prompt appeal: (1) prevention of oppressive incarceration; (2) minimization of anxiety and concern of those awaiting the outcome of

their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his defenses in case of reversal and retrial, might be impaired by the delay. *Moreno*, 63 M.J. at 138-41. Appellant fails to assert, let alone establish, prejudice from any of these prongs, and we find none. This factor weighs in favor of the Government.

In the absence of the assertion of his right to speedy review coupled with the lack of prejudice identified or experienced by the delay, our balancing of the four *Barker* factors leads us to conclude that Appellant was not denied his due process right to speedy review and appeal.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, Appellant's conviction of Specification 3 of Charge I is **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining finding is **AFFIRMED**. The sentence is **SET ASIDE**. The record is returned to the Judge Advocate General of the Navy for remand to an appropriate convening authority who may order a sentence rehearing.

Senior Judge HITESMAN and Judge GASTON concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court